UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

 JOHN PAUL GELSER,

                            Plaintiff,

        v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                           Defendant.

_____

**REPORT**
**and**
**RECOMMENDATION**

**09-CV-00803A(F)**

APPEARANCES:        PAUL M. RYTHER, ESQ.
                         Attorney for Plaintiff
                         97 Main Street
                         P.O. Box 278
                         East Bloomfield, New York 14443

                         WILLIAM J. HOCHUL, JR.
                         United States Attorney
                         Attorney for Defendant
                         KEVIN D. ROBINSON
                         Assistant United States Attorney, of Counsel
                         Federal Centre
                         138 Delaware Avenue
                         Buffalo, New York 14202

## JURISDICTION

    This action was referred to the undersigned by Honorable Richard J. Arcara on

December 23, 2009. The matter is presently before the court on motions for judgment

on the pleadings, filed on May 18, 2010, by Plaintiff (Doc. No. 7), and by Defendant

(Doc. No. 8).

## BACKGROUND

    Plaintiff John Paul Gelser ("Plaintiff"), seeks review of Defendant's decision

denying him Social Security Disability Insurance benefits ("SSDI") under Title II of the

Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits, Defendant determined Plaintiff had the severe impairments of depression, anxiety, and obesity, that Plaintiff's impairment of history of benign brain tumor was not severe, and that Plaintiff was not disabled at any time through the date of the application until the date of the hearing on July 28, 2008. (R. 19).

## **PROCEDURAL HISTORY**

Plaintiff filed an application for disability benefits on March 9, 2006 (R. 40-88), that was initially denied by Defendant on May 2, 2006. (R. 17-28). Pursuant to Plaintiff's request, filed June 9, 2006 (R. 38), a hearing was held before an Administrative Law Judge ("the ALJ") on July 28, 2008, in Rochester, New York. (R. 424-54). The Plaintiff, then represented by Raymond Sciarrino, Esq., appeared and testified at the hearing. Testimony was also given by Plaintiff's grandmother, Mary Twist ("Mrs. Twist"), and vocational expert Jay A. Steinbrenner ("Steinbrenner") ("the VE"). (R. 450-52). The ALJ's decision denying the claim was rendered on September 5, 2008. (R. 28). On September 29, 2008, Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 12-13). The ALJ's decision became Defendant's final decision when the Appeals Council denied Plaintiff's request for review on June 10, 2009. (R. 8). This action followed on September 11, 2009, with Plaintiff alleging the ALJ erred by failing to consider him disabled as of November 30, 2003. (Doc. No. 1).

Following the filing of Defendant's answer on December 18, 2009, including the record of the administrative proceedings (Doc. No. 4), on May 18, 2010, Defendant filed the instant motion for judgment on the pleadings ("Defendant's motion") together with a

memorandum of law (Doc. No. 9) ("Defendant's Memorandum"). Plaintiff filed a motion for judgment on the pleadings ("Plaintiff's motion") on May 18, 2010, accompanied by a supporting memorandum of law (Doc. No. 7) ("Plaintiff's Memorandum"). Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion should be GRANTED; Defendant's motion should be DENIED, and the matter remanded for calculation of benefits. The Clerk of the Court should be directed to close the file.

## **FACTS**[1]

Plaintiff, was born on September 11, 1978, completed one semester of college, and worked part time as a gas station clerk from 1999 until 2000, and a drugstore cashier from 2000 until November 30, 2003, the alleged date of disability onset. (R. 46-48). At the administrative hearing on July 28, 2008, Plaintiff was single, and lived with his mother and grandmother. (R. 427). Plaintiff alleges he is unable to work because of diabetes insipidus, thyroid problems, anxiety, and depression, all of which Plaintiff attributes to his history of a brain tumor. (R. 51).

In April 2006,[2] Plaintiff underwent surgery for removal of a craniopharyngioma (benign tumor that develops near the pituitary gland), and the implant of a ventriculoperitoneal shunt (shunt that connects the cerebral ventricle with the peritoneum (serous membrane lining the walls of the abdomen and pelvic cavity)) to re-

---

[1]Taken from the pleadings and the administrative record.

[2] The record does not indicate the exact date of Plaintiff's brain tumor diagnosis or surgery, only that Plaintiff was seventeen years old at the time of the surgery.

direct excess brain fluid to Plaintiff's stomach for obstructive hydrocephalus (abnormal expansion of the cavity of the brain caused by the collection of cerebrospinal fluid). (R. 281). Initially, Plaintiff responded well to the surgery. On April 1, 1996, Paul K. Maurer, M.D. ("Dr. Maurer"), opined Plaintiff's shunt was "working nicely," and Plaintiff was without "any significant evident incurred deficit from his preoperative state." (R. 272-73). On April 27, 1996, Yuji Namaguchi, M.D. (Dr. Namaguchi"), reviewed a computerized tomography scan ("CT scan") of Plaintiff's head, and noted an interval increase in the size of Plaintiff's left lateral ventricle.[3] (R. 274). On May 3, 1996, Dr. Maurer examined Plaintiff, and opined Plaintiff showed full ocular motility (visual tracking), normal smile and grimace, and no motor or dexterity loss, and that in the absence of any visual change, any increase in the size of a cyst in Plaintiff's infrachiasmatic recess (relating to optic function of brain) would not require further intervention. (R. 275). A CT scan on May 21, 2006, showed no change in the size or appearance of the mass noted on Plaintiff's April 27, 1996, CT scan. On May 9, 1997, David Lee, M.D. ("Dr. Lee"), and Louis S. Constine, M.D. ("Dr. Constine") evaluated a head CT scan conducted April 28, 1997, and opined the CT scan showed interval decrease in the size of Plaintiff's suprasellar (located above the bony structure at the base of the brain housing the pituitary gland) mass, and that Plaintiff "continued"[4] to exhibit left superior homonous quadrantanopsia (low vision or blindness in the lower quadrant of the left visual field)

_____

[3] The left lateral ventricle is located in the brain's left hemisphere, filled with cerebrospinal fluid, and is "one of four communicating cavities within the brain that are continuous with the central canal of the spinal cord." MedicineNet.com, Ventricle, underline available at
http://www.medterms.com/script/main/art.asp?articlekey=9162.

[4] The record does not reveal when Plaintiff exhibited homonous quadrantanopsia prior to Plaintiff's April 28, 1997 CT scan, but that fact is not relevant to this decision.

4

(R. 279), but, in general, [Plaintiff] appeared comfortable, and in no acute distress. Plaintiff, at that time, also denied visual disturbances, headaches, dizziness, nausea or vomiting, and there was no clinical evidence of recurrence of Plaintiff's tumor. Despite the initial success of Plaintiff's surgery, Plaintiff later experienced numerous medical complications and has relied on synthetic hormones to replace those his pituitary gland can no longer produce.

On May 21, 2004, after the alleged disability onset date, Plaintiff was admitted to Wyoming County Community Hospital in Warsaw, New York, with complaints of vomiting and diarrhea. (R. 101). At that time Plaintiff was morbidly obese, had hypertension, hyperlipidemia, high cholesterol, and, as a result of the craniopharyngioma surgery, deficient pituitary function, resulting in hypothyroidism, central adrenal insufficiency requiring oral hydrocortisone and testosterone injections, and diabetes insipidus (condition in which kidneys are unable to conserve water resulting in excessive thirst and increased urine volume). (R. 101-02). Upon examination, Salman Abbasey, M.D. ("Dr. Abbasey") diagnosed Plaintiff with dehydration and hypotension (low blood pressure) and treated Plaintiff with aggressive intravenous ("IV") hydration in the hospital's intensive care unit. (R. 102).

On July 15, 2004, Russell P. Maggio, M.D., ("Dr. Maggio"), Plaintiff's primary care physician, examined Plaintiff, and noted Plaintiff appeared pale and dehydrated. (R. 140). A blood test showed Plaintiff with lower than normal sodium and potassium levels, which led Dr. Maggio to diagnose Plaintiff with hyponatremia (low blood sodium), hypothyroidism (underactive thyroid), hypertension (high blood pressure), and adrenal insufficiency (inadequate steroid hormones in the adrenal gland), and admitted Plaintiff

to Strong Memorial Hospital in Rochester, New York, on July 16, 2004. (R. 204-21). Plaintiff's medications included Synthroid (thyroid deficiency), Cortisone (inflammation), Desmopressin ("DDAVP") (urine production), Lexapro (antidepressant), Amoxicillin (antibiotic), and Compazine (anti-psychotic). A consultative endocrinologist opined Plaintiff's hyponatremia was related to an overdose of Plaintiff's DDAVP medication. (R. 94).

On January 12, 2005, during a regular check up, Dr. Maggio diagnosed Plaintiff with psoriasis, and reviewed Plaintiff's diet. (R. 134). At that time Plaintiff's medications included Allopurinol (to decrease high levels of uric acid), Lotrel (hypertension), Lexapro (anti-depressant and anti-anxiety), Synthroid (for hypothyroidism), Prevacid (to treat gastrointestinal esophageal reflux disease or "GERD"), testosterone injections, DDAVP (diabetes insipidus), and Hydrocortisone (anti-inflammatory). On April 19, 2005, Plaintiff visited Dr. Maggio's office with complaints of sinus pressure, non-productive cough, fever, and nasal discharge. (R. 132). On June 20, 2005, during a follow-up visit, Dr. Maggio noted Plaintiff was not employed because of his agoraphobia (fear of big crowds), and that Plaintiff was concerned about his increased weight. (R. 130). Plaintiff's blood test on June 20, 2005, showed lower than normal  levels of thyroxine and tsh (thyroid hormones), a lower than normal BUN/creatinine ratio (blood urea nitrogen/serum creatinine ratio used to indicate kidney failure), and a higher than normal level of blood carbon dioxide. (R. 177).

On October 4, 2005, Heather Cook-Smith, R.N., F.N.P. ("Nurse Practitioner Cook-Smith"), a nurse practitioner in Dr. Maggio's office, noted Plaintiff, who weighed 360 pounds, had gained eight pounds since his last visit on June 20, 2005 (R. 130),

that Plaintiff's mood was "okay," but that Plaintiff "fel[t] down." (R. 128). On January 5, 2006, Hillary McConnell, R.N., F.N.P. ("Nurse Practitioner McConnell"), a nurse practitioner in Dr. Maggio's office, noted Plaintiff had not visited a psychiatrist because of costs, and that Plaintiff complained of frequent panic attacks, crying, panic around crowds, and a persistent fear of illness. (R. 127). On April 6, 2006, Nurse Practitioner McConnell noted Plaintiff complained of increased panic and anxiety when leaving his home, riding in a car, fear of extreme weather, and mood swings and anger "all the time." (R. 125). Nurse Practitioner McConnell noted Plaintiff no longer went out with friends, and experienced poor self esteem and self image since his brain surgery, diagnosed Plaintiff with anxiety and depression, diabetes insipidus, hypopituitarism (decreased secretion of one or more of the eight hormones produced by the pituitary gland), and hypogonadism (decreased testosterone), and referred Plaintiff to psychiatric counseling. (R. 125-A). Nurse Practitioner McConnell noted Plaintiff's medications included cortisone, Lexapro, Allopurinol, Synthroid, Prevacid, Ibuprofen, and bi-monthly testosterone injections. *Id*.

On April 19, 2006, Christine Ransom, PhD. ("Dr. Ransom"), conducted a consultative psychological examination on Plaintiff, and diagnosed Plaintiff with a major depressive disorder in remission, and mild to moderate selected phobias. (R. 229). Dr. Ransom opined Plaintiff was able to follow and understand simple directions and instructions, maintain attention and concentration for simple tasks, maintain a simple regular schedule, learn simple new tasks, make appropriate decisions and relate adequately with others, that Plaintiff exhibited mild to moderate difficulty dealing with stress under certain circumstances including in crowds, closed in spaces, and bad

7

weather conditions, and that Plaintiff's areas of difficulty were secondary to mild to moderate selected phobias. *Id*. Dr. Ransom opined Plaintiff's prognosis was "fair to good" with continued treatment and the addition of treatment for anxiety. *Id*.

On April 19, 2006, Brij Sinha, M.D. ("Dr. Sinha"), conducted a consultative internal medical examination on Plaintiff, and diagnosed Plaintiff with status post removal of a brain tumor, hypertension, depression, morbid obesity, phobia, psoriasis, and status post shunt in the brain. (R. 234). Dr. Sinha opined Plaintiff required a referral to a psychiatrist for depression and phobia, that Plaintiff's brain shunt created "some limitations,"[5] and that Plaintiff's morbid obesity resulted in physical limitations of a "nonspecific" type. (R. 234).

On April 27, 2006, Hillary Tzetzo, M.D. ("Dr. Tzetzo"), at the request of the Social Security Administration, conducted a consultative mental residual functional capacity assessment on Plaintiff, and assessed Plaintiff with "moderate" limitation to the ability to interact appropriately with the general public, the ability to work in coordination with, or in proximity to others without being distracted, and maintaining social functioning, and "mild" limitation to restriction of activities of daily living. (R. 237-250).

On June 13, 2006, in response to a request by Plaintiff's attorney, Dr. Maggio opined Plaintiff's morbid obesity precluded any type of strenuous work, that Plaintiff's post cranial scarring impaired Plaintiff's judgement, that Plaintiff was not capable of sustaining regular employment, and that he (Dr. Maggio) "strongly" suggested

---

[5] Although Dr. Sinha does not describe the "limitations" caused by the shunt, taken as a whole, the record reasonably supports the court's inference that the reference to "limitations" pertains to Plaintiff's mental or physical condition, or both.

neurologic input. (R. 255). On August 24, 2006, Nurse Practitioner McConnell noted Plaintiff complained of frequent panic attacks, increased anger and anxiety, and continued problems with crowds, but that Lexapro had improved Plaintiff's symptoms. (R. 126).

On June 15, 2006, Robert D. Potratz, MA ("Therapist Potratz"), a therapist working under the direct supervision of Robert Young, M.D. ("Dr. Young"), noted Plaintiff reported mood swings, "fairly frequent" anxiety and panic in overcrowded stores and riding in passenger vehicles, and that Plaintiff's anxiety resulted in rage and anger, emotional outbursts, and foul language. (R. 344).

On November 2, 2006, Dr. Young and Therapist Potratz completed a Psychiatric Evaluation Form for Anxiety Related Disorders ("Psychiatric Evaluation Form")(R. 258-66), opining Plaintiff showed symptoms of occasional apprehensive expectation, vigilance and scanning, restlessness, difficulty falling and staying asleep, frequent irritability and fatigue, very occasional autonomic hyperactivity, and that Plaintiff exhibited anxiety as his predominant disturbance. (R. 259-60). Plaintiff exhibited "marked" or "extreme" difficulty sustaining focused attention and concentration sufficiently long enough to permit the timely and proper completion of tasks in a work setting, or in settings including persistence in tasks, the ability to complete tasks in a timely manner, the ability to repeat sequences of actions to achieve a goal, the ability to assume increased mental demands associated with competitive work, and the ability to sustain tasks without an unreasonable number of break or rest periods. (R. 263-64). Plaintiff exhibited "marked" or "extreme" difficulty, either continuously or intermittently, in functioning independently, appropriately and/or effectively while holding a job (R. 263),

9

with personal hygiene (R. 262), and, that under stressful circumstances, Plaintiff either continuously or intermittently exhibited an inability to accept supervision, would withdraw from situations, exhibit an exacerbation of signs of his illness, deteriorate from his level of functioning, exhibit an inability to cope with schedules, exhibit poor decision making, and an inability to adapt to changing demands. (R. 264).

Significantly, the Psychiatric Evaluation Form Dr. Young, completed on November 2, 2006, contained a section titled "Impairments in maintaining concentration, persistence, or pace." (R. 263). With regard to this section, the form instructs:

> Please check any area in which your patient has exhibited marked or extreme difficulty in sustaining focused attention and concentration sufficiently long enough to permit the timely and appropriate completion of tasks in a work setting or in other settings.

(R. 263).

Dr. Young completed the section by placing on the line next to the separately listed areas, either an "x," indicating Plaintiff exhibited marked or extreme difficulty in the relative area, or the word "moderate," thereby indicating Plaintiff exhibited difficulty in the relative areas as follows:

> moderate  Independent functioning (requires much support and assistance)
> moderate Concentration
> ___x___ Persistence in tasks
> ___x___ Ability to complete tasks in a timely manner
> ___x___ Ability to repeat sequences of actions to achieve a goal
> ___x___ Ability to assume increased mental demands associated with competitive work
> ___x___ Ability to sustain tasks without an unreasonable number of breaks or rest periods
> moderate Ability to sustain tasks without undue interruptions or distractions

(R. 263).

Therapist Potratz diagnosed Plaintiff with panic disorder, agoraphobia,[6] depression, ruled out psychotic disorders, ruled out mood disorder secondary to medical condition, and assessed Plaintiff with a Global Assessment of Functioning ("GAF")[7] score of 52. (R. 349).

Since the alleged disability onset date, Plaintiff received mental health counseling treatment from Therapist Potratz on June 23, 2006 (R. 350), July 14, 2006 (R. 350), August 4, 2006 (R. 351), August 17, 2006 (R. 352), September 7, 2006 (R. 352), September 21, 2006 (R. 353), October 12, 2006 (R. 354), November 2, 2006 (R. 355), November 30, 2006 (R. 346), December 14, 2006 (R. 346), January 4, 2007 (R. 357), January 25, 2007 (R. 358), March 29, 2007 (R. 360), April 19, 2007 (R. 361), May 24, 2007 (R. 362), June 14, 2007 (R. 363), July 12, 2007 (R. 364), August 2, 2007 (R. 365), August 23, 2007 (R. 366), September 13, 2007 (R. 367), October 4, 2007 (R. 368), November 5, 2007 (R. 369), January 10, 2008 (R. 371), February 4, 2008 (R. 372), February 25, 2008 (R. 373), April 10, 2008 (R. 374), May 1, 2008 (R. 375), and May 19, 2008 (R. 376). Therapist Potratz's treatment notes show Plaintiff found

---

[6]The condition of having an irrational fear of being in a public place (especially when crowded) which would be difficult to leave in a hurry if something . . . happens. Included in the places someone fears are shopping centers, theaters, and busy streets, as well as trains, busses, airplanes, and elevators. See 1-A Attorney's Dictionary of Medicine, A-3836.

[7]The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Edition, Text Revision) ("DSM-IV-TR"). A GAF of 41-50 indicates: Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or social functioning (e.g., no friends, unable to keep a job) . . . A GAF of 51-60 [indicates] moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV-TR at 32.

Lexapro "helpful" (R. 352), that Plaintiff made "some progress regarding proneness to outbursts" (R. 353), that Plaintiff's "blowups" continued to decrease significantly compared to pre-treatment" (R. 358), but that Plaintiff continued to experience confrontation (R. 355), was more depressed (R. 355), felt his emotional "moving on" was only forty percent, became "terrified" if he felt anything was going wrong (R. 356), experienced intrusive daydreams two times each week that included being strapped, scared, and helpless in a hospital bed (R.357), experienced flashbacks about medical complications that were "worse than a horror movie" (R. 360), regressed in the progress of treating his outbursts (R. 362), and experienced avoidance and isolation behaviors because of years of agoraphobia (R. 369). Therapist Potratz noted Plaintiff felt "robbed" because prior to Plaintiff's brain surgery, Plaintiff gravitated toward people and liked being the center of attention, but that Plaintiff now exhibited avoidant behavior (R. 367, 369), and was "highly dependent." (R. 367). Therapist Potratz further noted Plaintiff described his emotional outbursts as more likely to occur before his bi-weekly testosterone shot, and that Plaintiff's emotions usually stabilized twenty-four hours after the testosterone shot was administered. (R. 414).

On November 26, 2007, Plaintiff sought treatment from Strong Memorial Hospital emergency department for severe jaw pain, where Aran Laing, M.D. ("Dr. Laing"), diagnosed Plaintiff with a tooth infection, and hospitalized Plaintiff for treatment of sepsis (a whole body inflammatory state). (R. 268). Plaintiff was hospitalized for two days, and discharged with prescriptions for Clindamycin and Augmentin (antibiotics). *Id*.

On December 14, 2007, Dr. Maggio noted Plaintiff complained of being anxious. (R. 316). On January 14, 2008, Dr. Maggio treated Plaintiff for a sinus infection. (R.

12

314). On May 9, 2008, Dr. Maggio noted Plaintiff exhibited acid reflux, a sore throat,

sinus pressure, and insomnia. (R. 312).

## DISCUSSION

**1.     Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or
> can be expected to last for a continuous period of not less
> than 12 months. . . .  An individual shall be determined to be
> under a disability only if his physical or mental impairment or
> impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform any past

relevant work, the burden shifts to the Commissioner to prove there is alternative

employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d

225, 231 (2d Cir. 1980).

**A.     Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding

disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law

judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S.

389, 401 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Pollard v. Halter,* 377 F.3d 183, 188 (2d Cir. 2004) *citing Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

While evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d)*; Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3). "Congress has instructed . . . that the factual findings of the Secretary,[8] if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The applicable regulations set forth a five-step analysis the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520

---

[8] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.

and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982). The first step is to determine whether the applicant is engaged in substantial gainful activity during the period of which benefits are claimed.  20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity the inquiry ceases and the claimant is not eligible for disability benefits. *Id.* The next step is to determine whether the applicant has a severe impairment which significantly limits the physical or mental ability to do basic work activities as defined in the applicable regulations.  20 C.F.R. §§ 404.1520(c) and 416.920(c). Absent an impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant with such an impairment is unable to perform substantial gainful activity.[9]  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*, 1986 WL 12118, * 2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he or she has done in the past, the applicant will be

---

[9] The applicant must also meet the duration requirement which mandates that the impairment must last or be expected to last for at least a twelve-month period.  20 C.F.R. §§ 404.1509 and 416.909.

denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work"). If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. *Id.* The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry, supra*, at 467. In reviewing the administrative finding, the court must follow the five-step analysis to determine if there was substantial evidence on which the Commissioner based the decision. *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

**B.**     **Substantial Gainful Activity**

The first inquiry is whether the applicant engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties" done for pay or profit. 20 C.F.R. § 404.1510(a)(b). Substantial work activity includes work activity that is done on a part-time basis even if it includes less responsibility or pay than work previously performed. 20 C.F.R. § 404.1572(a). Earnings may also determine engagement in substantial gainful activity. 20 C.F.R. § 404.1574.  In this case, the ALJ concluded Plaintiff did not engage in substantial activity since November 30, 2003, the alleged disability onset date. (R. 19). Plaintiff does not contest this finding.

## C.    Severe Physical or Mental Impairment

The second step of the analysis requires a determination whether Plaintiff has a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509 ("§ 404.1509), and significantly limits the Plaintiff's ability to do "basic work activities."  The Act defines "basic work activities" as "abilities and aptitudes necessary to do most jobs," and includes physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

Here, the ALJ found Plaintiff's impairments of depression, anxiety, and obesity were severe, but that Plaintiff's history of benign brain tumor removal was not severe. (R. 19). Plaintiff does not contest the ALJ's finding Plaintiff had the severe impairments of depression, anxiety, and obesity, but disputes the finding that Plaintiff's history of benign brain tumor removal was not a severe impairment. (Doc. 7). Contrary to the ALJ's finding that Plaintiff's history of benign brain tumor removal was not severe, substantial evidence in the record supports that Plaintiff's history of benign brain tumor is a severe impairment under 20 C.F.R. §§ 404.1521(b), 416.921(b), and significantly limits Plaintiff's ability to use judgment, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting.

In particular, Plaintiff testified he "wasn't able to deal with the pressure [of work] . . . [and] it got to the point where when [he] would feel upset or anything [he] would blow

17

up at [his] bosses." (R. 429). Plaintiff further testified he was fired "because it got to the point when I was, I'd start to get annoyed and say things to customers about the job and my boss and, because I was the only person working on my shift . . . I'd get to the point I'd have a line going through the store and I'd start to get panicky and I'd start telling customers how poorly run things were and the fact that they were too cheap to hire anybody and really take care of anything I was in control of and the boss finally says if you're going to run your mouth like that, how can I keep you . . . one time I called my boss something kind of mean behind her back and she just couldn't take it anymore." (R. 430). These statements are consistent with the statements Plaintiff made on a function report on April 5, 2006. (R. 59-66). In particular, Plaintiff reported his brain surgery resulted in the inability to follow instructions, difficulty counting money, resulted in problems getting along with bosses and people in authority, and that changes in Plaintiff's schedule caused Plaintiff to become panicky, verbally abusive, and anxious. (R. 65-66).

Plaintiff's repeated description/characterization of his condition is also consistent with the medical record. In particular, Dr. Maggio opined on June 13, 2006, that Plaintiff's post-craniotomy corticol scarring impaired Plaintiff's judgment, strongly suggesting neurologic input. (R. 255). A psychiatric evaluation on April 19, 2006, by Dr. Ransom showed Plaintiff able to follow simple instructions, perform simple tasks independently, maintain attention and concentration, and learn simple new tasks, but that Plaintiff exhibited mild to moderate difficulty dealing with stress under certain circumstances, including in crowds, closed in spaces, and bad weather conditions. (R. 229). On April 27, 2006, Dr. Tzetzo evaluated Plaintiff with a "moderate" limitation to the

ability to complete a normal workday without interruption from psychologically related symptoms, the ability to interact appropriately with the general public, and work in coordination with or in proximity to others without being distracted by them. (R. 236-50).

Moreover, on the Psychiatric Evaluation Form on November 2, 2006, Plaintiff was evaluated with "marked" or "extreme" limitation to the ability to complete tasks in a timely manner, repeat sequences of actions to achieve a goal, assume increased mental demands associated with competitive work, sustain tasks without an unreasonable number of breaks or rest periods, and a "moderate" ability to sustain tasks without undue interruptions or distractions.[10] (R. 263). Dr. Young also opined stressful situations would exacerbate Plaintiff's ability to accept supervision, withdrawal from stressful situations, cope with schedules, make appropriate decisions, and adapt to changing demands, thereby significantly limiting Plaintiff's ability to perform basic work activities as required under 20 C.F.R. §§ 404.1521(b), 416.921(b)(R. 264).

Substantial evidence in the record thus establishes, contrary to the finding of the ALJ (R. 19), that the surgical removal of Plaintiff's benign brain tumor severely impaired Plaintiff's ability to perform basic work activities resulting in a severe impairment under § 404.1509.

**D.** **Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of

---

[10]As discussed, Discussion, *infra*, at 30-31, the ALJ misinterpreted Dr. Young's findings, Facts, *supra*, at 10, regarding Plaintiff's impairments in maintaining concentration, persistence, or pace, determining Dr. Young's placement of an "x" on the line next to some of the separately listed areas as an indication Plaintiff was only moderately limited in those areas. (R. 24).

19

Impairments"). If the impairments are listed in the Appendix, and the duration requirement is satisfied, the impairment or impairments are considered severe enough to prevent the claimant from performing any gainful activity and the claimant is considered disabled. 20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d. 45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled").

The relevant listing of impairments in this case include 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 12.02 (organic mental disorders) (§ 12.02), 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 12.04 (affective disorders) (§ 12.04), 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 12.06 (anxiety related disorders) (§ 12.06), and 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 9.05 (neurohypophyseal insufficiency (diabetes insipidus)) (§ 9.05).

Relevant to the instant case, disability under § 12.02 (organic mental disorders), is characterized by "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.02. The required level of severity for disability based on an organic mental disorder is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied:

> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
> 1. Disorientation to time or place;
> 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
> 3. Perceptual or thinking disturbances (e.g. hallucinations, delusions); or

4. Change in personality; or
5. Disturbance in mood; or
6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuro-psychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Materially documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psycho-social support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.02.

In this case, the ALJ, as required, evaluated Plaintiff's impairments under 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526 directed to consideration of the Listing of Impairments, and determined Plaintiff's history of brain tumor removal was not accompanied by the required clinical signs and diagnostic findings under the Act, and Plaintiff's history of benign brain tumor was not severe because Plaintiff's April 28, 1997 CT scan showed "interval decrease in the size of the right suprasellar mass . . . partial opacification of multiple sinuses, including the bilateral ethmoid, maxillary and right sephnoid . . . [that Plaintiff] denie[d] any visual disturbances, headaches, dizziness, or vomiting . . . was comfortable and in no acute distress . . . [and had] no clinical

evidence of recurrence." (R. 19-20). This finding is not supported by substantial evidence in the record.

Inasmuch as Plaintiff's April 28, 1997, CT scan lacked clinical evidence of any recurrence of Plaintiff's benign brain tumor, substantial evidence in the record supports "presence of a specific organic factor judged to be etiologically related to Plaintiff's abnormal mental state and loss of previously acquired functional abilities," the threshold requirement under 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.02. In particular, on April 19, 2006, Dr. Sinha opined Plaintiff's brain shunt created "some limitations." (R. 234). On May 22, 1996, Dr. Yamaguchi opined that Plaintiff's May 21, 1996 head CT showed "a partially calcified suprasellar mass which is unchanged both in size and configuration when compared with the previous study . . . there may be a slight amount of edema surrounding this mass." (R. 277). On June 13, 2006, Dr. Maggio opined post craniotomy corticol scarring impaired Plaintiff's judgement (R. 255). This medical evidence is consistent with statements on a disability questionnaire Plaintiff completed April 5, 2006, where Plaintiff stated he "had problems with paying attention due to brain injury, inability to follow direction and difficulty with concentration" (R. 20), thereby meeting the threshold requirement of § 12.02. Substantial evidence in the record also supports Plaintiff met the required level of severity under § 12.02A.4 (change in personality). Substantial evidence also establishes Plaintiff met the required level of severity under § 12.02A.6 (emotional lability).

The regulations provide examples of emotional lability that include explosive temper outbursts, sudden crying, and impairment in impulse control, and substantial evidence in the record supports the medically documented persistence of Plaintiff's

emotional lability under § 12.02A.6. In particular, on June 13, 2006, Dr. Maggio opined Plaintiff's post craniotomy scarring impaired Plaintiff's judgement (R. 255), and Plaintiff was in mental health counseling to deal with panic attacks associated with the implant of a stomach shunt resulting from his brain tumor removal. (R. 432). The medication used to replace the hormones in Plaintiff's pituitary gland caused Plaintiff to become "very moody," "have outbursts," and not get along with his family. (R. 434). Consistent with the record's medical treatment notes, Plaintiff testified he felt "robbed" because prior to his brain surgery he used to gravitate toward people, and liked being the center of attention, but now experienced avoidant behavior, had an underlying fear of being alone (R. 367), was isolated (R 369), and was highly dependent (R. 367). Plaintiff's grandmother, Mrs. Twist, testified Plaintiff's personality changed after his brain surgery, that before the surgery to remove Plaintiff's brain tumor Plaintiff  was " very outgoing, fun, loving, never swore or became belligerent at all to anything and after that, the minute you crossed him a little bit, he'd get loud and use foul language." (R. 446). The record thus establishes Plaintiff met the criteria under § 12.02A.4 (change in personality).

Substantial evidence also supports Plaintiff experienced affective changes with persistent emotional lability and explosive temper outbursts as required under § 12.02A.6 (emotional lability (e.g. explosive temper outbursts)). In particular, Plaintiff testified he "wasn't able to deal with the pressure [at work] because it got to the point when [he] would feel upset or anything, [he] would blow up at [his] bosses and there were times [he would] get very belligerent." (R. 429)(underlining added). Therapist Potratz's treatment notes reflect Plaintiff persistently complained of "blowing up" at his

mother and grandmother (R. 350, 352, 355), and that although medication reduced the frequency of Plaintiff's temper outbursts (R. 358), he continued to "blowup" at unexpected times. Plaintiff testified that when his mother asked him something simple, like how was your day he would "just vulgarly say something not nice like F you and things that for no reason, and I'll just - - and she doesn't deserve it." (R. 435). Plaintiff's grandmother testified Plaintiff's personality changed after his brain tumor surgery, and although Plaintiff used to be "outgoing, fun, loving, never swore or became belligerent at all to anything" that after the surgery "the minute you crossed him a little bit, he'd get loud and use foul language and just be miserable" (R. 446)(underlining added), thus meeting the criteria under § 12.02A.6 (emotional lability). Having met the criteria under both § 12.02A.4 and § 12.02A.6, the court considers whether Plaintiff also meets the criteria under § 12.02B.

To be found disabled under § 12.02B.1, at least two of the following must also be present: (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404., Subpt. P, App. 1 § 12.02B ("§ 12.02B"). In this case, the ALJ found substantial evidence in the record showed Plaintiff's brain tumor removal did not result in a marked restriction of activities of daily living under § 12.02B1. Plaintiff disputes the ALJ's finding Plaintiff's brain tumor did not result in marked restriction of activities of daily living, difficulties maintaining social functioning, or difficulties in maintaining concentration, persistence, or pace. Although substantial evidence in the record supports the ALJ's finding Plaintiff's brain tumor did not result in a "marked"

24

restriction of Plaintiff's activities of daily living, or repeated episodes of decompensation, such evidence establishes Plaintiff is markedly restricted in maintaining social functioning, as well as concentration, persistence and pace.

Activities of daily living include adaptive activities like cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, personal hygiene, and using a post office. 20 C.F.R. Pt. 404., Subpt. P, App. 1 § 12.00C1. In particular, on November 2, 2006, Dr. Young and Therapist Potratz completed a psychiatric evaluation and opined Plaintiff exhibited a "marked" impairment with personal hygiene, but opined Plaintiff did not exhibit a "marked" limitation to grooming, shopping, cooking, cleaning, using the phone, using public transportation, or initiating and participating in activities independent of supervision and direction. (R. 262). Plaintiff testified he took out the garbage, washed dishes, cooked food in the microwave, watched television, and worked on the computer (R. 439-40). Such activities, without more, do not rise to the level of a "marked" restriction of activities of daily living as required under § 12.02B1. *Gentle v. Barnhart*, 430 F. 3d 865, 867 (7th Cir. 2005) (the ability to engage in such activities unaided or without difficulty does not rise to the level of a marked restriction of activities of daily living).

Nevertheless, contrary to the ALJ's finding that Plaintiff exhibited only "moderate" difficulties maintaining social functioning (R. 21), substantial evidence in the record supports Plaintiff exhibited "marked" difficulties in maintaining social functioning as required under 20 C.F.R. Pt. 404., Subpt. P, App. 1 § 12.02B2 ("§ 12.02B2"). Social functioning refers to a claimant's capacity to interact independently and on a sustained basis with other individuals, including the ability to get along with others, such as family

25

members, friends, neighbors, or bus drivers. 20 C.F.R. Pt. 404., Subpt. P, App. 1 § 12.00C2 ("§ 12.00C2"). The regulations provide examples of impaired social functioning that include a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. § 12.00C2. As relevant to the instant record, social functioning in work situations includes interactions with the public, responding appropriately to persons in authority, or cooperative behaviors involving coworkers. *Id.*

Here, Plaintiff and his grandmother testified to Plaintiff's long-history of altercations with his mother and grandmother. *See* Facts, *supra,* at 9. For example, Plaintiff testified he was fired from his job as a gas station attendant because he would get annoyed and say inappropriate things to customers about his boss (R. 430), and left his previous job as a cashier because he "just wasn't able to deal with the pressure." (R. 429). On a psychiatric evaluation form completed on November 2, 2006, Dr. Young, indicated Plaintiff was moderately impaired in cooperating with others and getting along with family members, but "marked" in social functioning related to holding a job. (R. 263). On June 23, 2006, Therapist Potratz diagnosed Plaintiff with agoraphobia (R. 349), and on November 5, 2007, Therapist Potratz noted Plaintiff felt "robbed" because prior to Plaintiff's brain surgery he gravitated toward people and liked being the center of attention, but now exhibited avoidance, isolation, and dependent behaviors. (R 369).

The record also establishes the ALJ failed, in accordance with the treating physician rule, to give controlling weight to the opinions of Dr. Maggio (Plaintiff's treating physician), and Dr. Young (Plaintiff's treating psychiatrist), as to their findings of Plaintiff's impaired social functioning. 20 C.F.R. § 404.1527(d) requires the ALJ give a

treating physician's opinion "controlling weight" if the opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in [the] case record." 20 C.F.R. §

404.1527(d)(2). In particular, the Act provides

> [g]enerally, we give more weight to opinions from your
> treating sources, since these sources are likely to be the
> medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may
> bring a unique perspective to the medical evidence that
> cannot be obtained from the objective medical findings alone
> or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations. If we find
> that a treating source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling
> weight.

20 C.F.R. § 404.1527(d)(2); *Clark v. Commissioner of Soc. Sec.*, 114 F.3d. 115,

118 (2d Cir. 1998).

The regulations define "treating source" as a claimant's "own physician, psychologist, or

other acceptable medical source who provides [a claimant] ... with medical treatment or

evaluation and who has, or has had, an ongoing treatment relationship with [the

claimant]." 20 C.F.R. § 404.1502. Certain factors must be considered by the court in

determining whether an ALJ correctly refused to give the "treating physician's opinion"

controlling weight. These factors  include: "i) the frequency of examination and the

length, nature, and extent of the treatment relationship; (ii) the evidence in support of

the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether

the opinion is from a specialist." *Clark* 143 F.3d. at 118. Generally, the longer a

claimant is treated and seen by a treating source, the more weight is to be afforded by the ALJ to the treating source's medical opinion, §404.1527(d)(2)(I), and added weight is given to specialist opinions and opinions supported by laboratory tests. *Id*.

The frequency and nature of Dr. Maggio's multiple medical examinations and supporting clinical tests establish Dr. Maggio was Plaintiff's treating physician for purposes of the Act. In particular, Dr. Maggio began treating Plaintiff on April 2, 2003 (R. 123-24), and treated Plaintiff on April 25, 2003 (R. 171-73), June 20, 2003 (R. 166-67), July 8, 2003 (R. 164-65), August 1, 2003 (R. 158-59), August 18, 2003 (R. 156-57), August 27, 2003 (R. 154-55). Dr. Maggio examined Plaintiff on June 1, 2004 (R. 146-47), July 12, 2004 (R. 142), January 12, 2005 (R. 134-35), April 19, 2005 (R. 132), June 20, 2005 (R. 130-31), June 13, 2006 (R. 255), June 16, 2006 (R. 331), July 10, 2006 (R. 329-30), November 7, 2006 (R. 325), June 15, 2007 (R. 323-24), October 26, 2007 (R. 320), December 14, 2007 (R. 316), and January 14, 2008 (R. 314). Dr. Maggio ordered and reviewed blood tests on Plaintiff on April 2, 2003 (R. 123-24), June 1, 2004 (R. 183), January 12, 2005 (R. 178), June 20, 2005 (R. 177), June 16, 2006 (R. 286), and November 27, 2006 (R. 290), and Dr. Maggio's nurse practitioners, including Nurse Practitioners McConnell and Heather Cook-Smith, acting under the direct supervision of Dr. Maggio, treated Plaintiff on a minimum of ten separate occasions (R. 125-A, 126-A, 127-A, 129, 133, 137, 145, 149, 151, 153, 157, 161), thus substantial evidence in the record establishes Dr. Maggio is Plaintiff's treating physician for purposes of the Act, and Dr. Maggio's opinion is entitled to controlling weight provided the opinion is consistent with the record as a whole. *Clark*, 143 F. 3d at 118. Dr. Young and Therapist Potratz treated Plaintiff on a minimum of twenty-seven occasions over a two year

period. (R. 343-376), and, as Plaintiff's treating psychiatrist and therapist, the opinions of Dr. Young, and Therapist Potratz, also find support from substantial medical evidence in the record.

Significantly, on June 13, 2006, Dr. Maggio opined that Plaintiff's morbid obesity precluded any type of strenuous work, and that post craniotomy scarring impaired Plaintiff's judgment, and that Plaintiff was not capable of sustaining regular employment. (R. 255). This opinion is consistent with the record as a whole. Specifically, on April 6, 2006, Nurse Practitioner McConnell noted Plaintiff complained of increased panic and anxiety when leaving the house, riding in a car, that Plaintiff experienced mood swings and anger all the time, that Plaintiff did not go out often with friends. (R. 125). On April 19, 2006, Dr. Sinha conducted a consultative internal medical examination on Plaintiff and opined Plaintiff's prognosis was "fair to stable," that Plaintiff should be referred to a psychiatrist for depression and phobia, Plaintiff's obesity gave him some physical limitations of a nonspecific type, and that Plaintiff's shunt "create[d] some limitations." (R. 134). Plaintiff repeatedly complained he suffered panic attacks in crowds (R. 126-127, 344, 441-42), and experienced panic episodes at times even when no triggering circumstances were apparent. (R. 354). Although Dr. Ransom opined Plaintiff's prognosis was "fair to good . . . with continued treatment and the addition of treatment for anxiety," and noted Plaintiff denied panic attacks (R. 227-28), the ALJ's finding did not address this inconsistency with other substantial evidence in the record. It is established that the ALJ, must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). *See also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)("ALJ cannot disregard medical

evidence simply because it is at odds with the ALJ's own unqualified opinion.").

Although treating physician's opinions are not determinative and are given controlling

weight only when not inconsistent with the other controlling evidence, 20 C.F.R.

§404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (citing *Vieno v.*

*Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d

Cir. 1993)), Dr. Maggio's opinions gain support in the record from treatment notes by

treating psychiatrist Dr. Young, and treating Therapist Potratz, testimony from Plaintiff

(R. 429-45), and Plaintiff's grandmother (R. 46-49), and diagnostic tests including head

CT scans (R. 274, 279), and blood work (R. 177-79; 181-84). Nevertheless, the ALJ,

erred by refusing to grant appropriate weight to Dr. Maggio's opinion that post-

craniotomy scarring impaired Plaintiff's judgment, and Dr. Maggio's conclusion Plaintiff

was not able to sustain regular employment. The ALJ's determination Dr. Maggio's

opinion was "quite conclusory," without discussion, further violated the Act's

requirement an ALJ always give "good reasons in [the] notice of determination or

decision for the weight given a claimant's treating source's opinion." § 404.1527(d)(2).

Substantial evidence in the record thus supports Plaintiff exhibited impaired social

functioning as required under § 12.02B2.

Furthermore, contrary to the ALJ's finding Plaintiff exhibited "moderate"

difficulties to concentration, persistence, or pace because Plaintiff "has a license to

drive" and "is able to manage money" (R. 21), substantial evidence in the record

supports Plaintiff exhibited "marked" limitations to concentration, persistence and pace

as required under § 12.02C3. Concentration, persistence, or pace refers to a disability

claimant's ability to sustain focused attention and concentration sufficiently long to

permit the timely and appropriate completion of tasks commonly found in work settings. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C3 ("§ 12.00C3"). A claimant who is capable of completing many simple tasks may have a "marked" limitation if they are unable to complete the tasks in accordance with accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions. *Id*.

In particular, as to Plaintiff, on November 2, 2006, Dr. Young, while completing a Psychiatric Evaluation for Anxiety Related Disorders form, by placing an x on the line next to the relevant categories as the form instructed, opined Plaintiff exhibited "marked" or "extreme" difficulty in sustaining focused attention, the ability to concentrate long enough to permit the timely and appropriate completion of tasks in a work setting or other setting including ability to complete tasks in a timely manner, the ability to repeat sequences of actions to achieve a goal, the ability to assume increased mental demands associated with competitive work, the ability to sustain tasks without a reasonable number of breaks or rest periods. (R. 263). Dr. Young then indicated Plaintiff exhibited "moderate" difficulty to independent functioning, concentration, and the ability to sustain tasks without undue interruptions or distractions, by writing in the word "moderate" on each line preceding these categories. *Id*. Significantly, the ALJ, however, mischaracterized Dr. Young's opinion by interpreting Dr. Young's placement of an x on the line before some categories as indicating a "moderate" impairment. Specifically, the ALJ stated

> Dr. Young . . . notes the claimant has moderate difficulty with independent function; persistence in tasks; ability to complete tasks in a timely manner; ability to repeat sequences of actions to achieve a goal; ability to assume increased

31

mental demands associated with competitive work; ability to sustain tasks without an unreasonable number of breaks or rest periods. (R. 24).

However, a simple comparison between these assertions and Dr. Young's actual notations, Facts, *supra*, at 10, demonstrate the possibly inadvertent but nevertheless erroneous nature of the ALJ's interpretation of Dr. Young's findings. Thus, whereas Dr. Young found that Plaintiff was markedly limited in the areas of persistence in tasks, ability to complete tasks in a timely manner, ability to repeat sequences of actions to achieve a goal, ability to assume increased mental demands associated with competitive work, and sustain tasks without an unreasonable number of breaks or rest periods, Facts, *supra* at 10, the ALJ stated that Dr. Young had found Plaintiff had moderate difficulty with persistence in tasks, ability to complete tasks in a timely manner, ability to repeat sequences of actions to achieve a goal, ability to assume increased mental demands associated with competitive work, and sustain tasks without an unreasonable number of breaks or rest periods. (R. 24). Additionally, on April 5, 2006, Plaintiff completed a disability questionnaire and reported the inability to follow directions, difficulty counting money, and short term memory loss. (R. 65-66).

Notably, although the summary portion of Therapist Potratz's treatment notes indicate Plaintiff had only mild depression at the time of the hearing (April 10, 2008, R. 374; May 1, 2008, R. 375; May 19, 2008, R. 376), the narrative portion of those same notes show Plaintiff had "vivid flashbacks of [his] medical complications" (R. 360), "several . . . remind [Plaintiff] of past medical traumatization related to his brain tumor at 17 . . . [and] he continues to experience residual effects of these difficult times" (R. 375), "blow[n] up more lately . . . without sufficient reason . . . has depressed states that

32

can last a couple of hours, feels discouraged, defeated, . . . and upset with the direction of his life" (R. 376).  Significantly, no evidence in the record contradicts Dr. Young's earlier opinion that Plaintiff exhibited marked restrictions of concentration, persistence, or pace. (R. 255). The ALJ's opinion thus does not have support of substantial evidence in the record, and is therefore, without merit. *Kohler v. Astrue*, 546 F. 3d 260, 268 (2d Cir. 2008) (remand appropriate where ALJ failed to take test result of claimant's "moderate" level of functioning into account).

The ALJ also granted only "some weight," rather than controlling weight, to the opinion of Dr. Young, and found "while the doctor does have a treating relationship with the claimant, the treatment history is quite brief." (R. 26). This is also contrary to substantial evidence in the record. As discussed *supra*, at 26-39, Dr. Young is Plaintiff's treating psychiatrist, and, as such, his opinion is entitled to controlling weight provided it is supported by medically acceptable clinical and diagnostic laboratory diagnostic techniques and not inconsistent with substantial evidence in the record. As relevant, Dr. Young stated he first treated Plaintiff on June 23, 2006, and saw Plaintiff on average once every three weeks. (R. 24). Dr. Young's clinical associate Therapist Potratz, who treated Plaintiff under the direct supervision of Dr. Young, and provided psychotherapy to Plaintiff at the Wyoming County Mental Health Clinic a minimum of thirty-eight times over a two-year period should be considered treatment by a treating psychiatrist. (R. 344-76). *Walterich v. Astrue*, 578 F. Supp. 2d 482, 515 (W.D.N.Y. 2008) (psychiatric treatment provided by psychiatric nurse under the supervision of a treating psychiatrist considered treatment by treating psychiatrist). On February 15, 2007, Dr. Young reviewed Plaintiff's treatment plan with Therapist Potratz (R. 35), rated Plaintiff's social

exposure and participation as "four" on a ten point scale, and noted Plaintiff "remain[ed] associated primarily with [his] family" and "required further work in this area." (R. 359). Thus, the ALJ's finding as a ground not to credit fully Dr. Young's opinion of Plaintiff's disability that Plaintiff's treatment history with Dr. Young "is quite brief" is not supported by substantial evidence in the record, and therefore does not comply with the treating physician rule. Accordingly, Dr. Young's assessment of Plaintiff's marked psychological impairments as a basis for finding Plaintiff is disabled are entitled to full credit.

Additionally, the ALJ's assertion Plaintiff's complaints regarding the "intensity, persistence and limiting effects" of Plaintiff's symptoms were "not entirely credible" is also not supported by substantial evidence in the record. (R. 25). In particular, the ALJ determined:

> [i]n terms of [Plaintiff's] alleged depression, anxiety, and obesity impairments, I note that he drives daily. He can and does help with cooking, shopping and could do the laundry but his family does it. He has no problems of activities of daily living although he prefers to stay in the home. He is adept at surfing the internet and listens to music regularly. He is just starting therapy and goes once every three weeks after a long absence. (R. 25).

Contrary to the ALJ's finding Plaintiff "prefers to stay in the home," substantial evidence in the record supports Plaintiff repeatedly asserted symptoms consistent with agoraphobia, and by virtue of the disease (irrational fear of being in crowded public places), is reticent to go into public or crowded spaces. (R. 126-27, 130, 228, 260, 344, 349, 369). Significantly, no treating source has ever questioned the sincerity of Plaintiff's claimed irrational fears, including specifically agoraphobia, but instead, have repeatedly diagnosed Plaintiff with psychiatric impairments based on such claims, for which psychiatric medicines were prescribed. (R. 125, 127, 285). Again, contrary to the

ALJ's finding, the record thus contains substantial evidence establishing Plaintiff meets the disability criteria of § 12.02C.3

Further, the Act requires the ALJ consider all of a claimant's symptoms, including pain, and the extent to which the symptoms *can reasonably be accepted as consistent with the objective medical evidence, and other evidence.* 20 C.F.R. § 416.929(a) (italics added). On June 23, 2006, Therapist Potratz diagnosed Plaintiff with agoraphobia (R. 349), making the ALJ's determination Plaintiff "prefers to stay in the home" misplaced. The ALJ's finding Plaintiff "is just starting therapy for depression" is also contrary to substantial evidence in the record, given that Plaintiff received mental health counseling from the Wyoming County Mental Health Clinic a minimum of thirty-eight times in a two-year period. (R. 344-76). *See Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996) (finding substantial evidence did not support the ALJ's decision that the claimant was not credible where, *inter alia*, the ALJ made several factual errors in evaluating the medical evidence). Thus, substantial evidence in the record supports Plaintiff is disabled under § 12.02 (organic mental disorders).

Disability under § 12.04 (affective disorders), is characterized by "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.04A1 requires medically documented persistence, either continuous or intermittent, of four of the following:

(a)     Anhedonia or pervasive loss of interest in almost all activities; or
(b)     Appetite disturbance with change in weight; or
(c)     Sleep disturbance; or
(d)     Psychomotor agitation or retardation; or
(e)     Decreased energy; or
(f)     Feelings of guilt or worthlessness; or
(g)     Difficulty concentrating or thinking; or

35

(h)     Thoughts of suicide; or
(i)     Hallucinations, delusions or paranoid thinking; . . .
    AND
B.     Resulting in at least two of the following:
 1.     Marked restriction of activities of daily living; or
 2.     Marked difficulties in maintaining social functioning; or
 3.     Marked difficulties in maintaining concentration, persistence, or pace; or
 4.     Repeated episodes of decompensation, each of extended duration. OR
C.     Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
 1.     Repeated episodes of decompensation, each of extended duration; or
 2.     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or  change in the environment would be predicted to cause the individual to decompensate; or
 3.     Current history of 1 or more years' inability to function outside of a highly supportive living arrangement, with an indication of continued  need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

To establish disability under § 12.04, a claimant must meet the criteria either for both § 12.04A and § 12.04B, or § 12.04C. In this case, the ALJ did not address whether Plaintiff meets the criteria of § 12.04A, but instead limited the discussion to § 12.04B and § 12.04C, presumably because substantial evidence in the record supports Plaintiff's depression met the criteria of severity under § 12.04A. Contrary to the ALJ's finding Plaintiff met the criteria under § 12.04A, substantial evidence in the record supports Plaintiff does not meet the criteria under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A.

In particular, although on April 19, 2006, Dr. Ransom diagnosed Plaintiff with "[m]ajor depressive disorder, currently in remission" (R. 229), and Plaintiff reported sleep disturbances (R. 312,316, 325), substantial evidence in the record does not

support Plaintiff experienced anhedonia (§ 12.04A1a), appetite disturbance (§ 12.04A1b), psychomotor agitation or retardation (§ 12.04A1d), decreased energy (§ 12.04A1e), thoughts of suicide (§ 12.04A1h), or hallucinations, delusions, or paranoid thinking (§ 12.04A1i). As discussed, Discussion, *supra*, at 26-27, substantial evidence in the record supports Plaintiff experienced difficulty concentrating or thinking, but this, without more, does not satisfy the criteria required under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

The ALJ found Plaintiff was not disabled under § 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (anxiety related disorders), however, substantial evidence in the record supports Plaintiff met the criteria under § 12.06.

To establish disability under § 12.06, anxiety is either the predominant disturbance, or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. The required level of severity for an anxiety related disorder is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied:

A. Medically documented findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning; or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress;

or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
AND
B. Resulting in at least two of the following:
  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or
  3. Marked difficulties in maintaining concentration, persistence, or pace; or
  4. Repeated episodes of decompensation, each of extended duration. OR
C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

In the instant case, as stated, the ALJ did not address the "paragraph A" criteria, presumably because substantial evidence in the record established Plaintiff met the criteria under § 12.06A, and, although substantial evidence in the record supports Plaintiff did not meet the required criteria under § 12.06A1, Plaintiff meets the criteria under § 12.06A2, §12.06A3, and § 12.06B.

In particular, on April 19, 2006, Dr. Ransom noted Plaintiff often worried about bad weather, being in closed spaces, and being around crowds of people. (R. 228). Dr. Young opined Plaintiff exhibited an irrational fear of crowds, and being a passenger in a vehicle (R. 260), that Plaintiff's phobia resulted in a compelling desire to avoid the situation(s), and that Plaintiff experienced moderate recurrent panic attacks. *Id*. On January 5, 2006, Nurse Practitioner McConnell noted Plaintiff did not like to leave home or go out. (R. 127). Plaintiff testified he left his job as a cashier because he experienced panic attacks about driving (R. 429), and became belligerent, claustrophobic, and would swear when exposed to crowded situations. (R. 440-41). Plaintiff reported he suffered panic attacks in crowds (R. 126-127, 344), experienced panic episodes at times even when no triggering circumstances were apparent (R. 354), and that "at the Lilac Festival

. . . [the] parade started and I just started swearing left and right and these people were there with their kids and my mom is like they've got little kids and it didn't even matter to me at that point." (R. 441-42). On June 20, 2005, Dr. Maggio noted Plaintiff was not getting a job because of his phobia of big crowds. (R. 130). On June 23, 2006, Therapist Potratz diagnosed Plaintiff with agoraphobia. (R. 349). Thus, substantial evidence in the record supports Plaintiff met the criteria under § 12.06A2, and, as previously discussed, met the criteria under § 12.06B and § 12.06C, Discussion, *supra,* at 22-27, and thus was disabled under § 12.06 (anxiety related disorders).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.05 (diabetes insipidus) requires a urine specific gravity test (test that measures the kidney's ability to dilute urine in relation to plasma) result of 1.005 or below, persistent for at least 3 months accompanied by recurrent dehydration. In this case, the ALJ found Plaintiff's diabetes insipidus was not severe, and substantial evidence in the record supports this determination. In particular, Plaintiff's urine test results on June 1, 2004, showed a urine specific gravity of 1.023. (R. 183). A urine test on Plaintiff on July 28, 2004, did not include a measure of specific gravity (R. 181), and although Plaintiff was hospitalized for dehydration on May 21, 2004 (R. 102), this without more substantial evidence, does not meet the criteria under § 9.05 of the Act.

Although the record establishes Plaintiff meets the criteria of disability based on the listed impairments of both § 12.02 (organic mental disorders) and § 12.06 (anxiety related disorders), such that Plaintiff is disabled and the court's analysis should close, because the decision is before this court for a report and recommendation, the court proceeds, in the interest of completeness, to the next step of the inquiry.

39

**E.     "Residual Functional Capacity" to Perform Past Work**

The fourth inquiry in the five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work. "Residual functional capacity" is defined as the most work a claimant can still do despite limitations from an impairment and/or its related symptoms. 20 C.F.R. § 416.945(a). If a claimant's residual functional capacity is insufficient to allow the performance of past relevant work, the ALJ must assess the claimant's ability to adjust to any other work. 20 C.F.R. § 416.960(c).

**F.     Suitable Alternative Employment in the National Economy**

Once an ALJ finds a plaintiff's impairments prevent a return to previous work, the burden shifts to the Commissioner to prove substantial gainful work exists and that the plaintiff is able to perform in light of her physical capabilities, age, education, experience, and training. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

In this case, the ALJ concluded Plaintiff was unable to perform his past relevant work as a cashier and gas station attendant. (R. 26). That finding is undisputed. The Second Circuit requires that "all complaints . . . must be considered together in determining . . . work capacity."  *DeLeon v. Secretary of Health and Human Services,* 734 F.2d at 937 (2d Cir. 1984). The ALJ further found Plaintiff retained the residual functional capacity to perform light work as defined under 20 C.F.R. §404.1567(b) with the limitations of occasional interaction with coworkers and the general public, sufficient attention and concentration to understand, remember and follow simple instructions, and avoid large crowds or crowded situations at work. (R. 21). The ALJ further opined Plaintiff's combination of exertional and non exertional limitations did not significantly

reduce the occupational base of light work and that Plaintiff was not disabled. (R. 27).

It is improper to determine a claimant's residual work capacity based solely upon an evaluation of the severity of the claimant's individual complaints. *DeLeon*, 734 F.2d at 937. To make such a determination, the Commissioner must first show that the applicant's impairment or impairments are such that they nevertheless permit certain basic work activities essential for other employment opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities." *Id*. at 294.

An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very heavy" work.[11] *Decker*, 647 F.2d at 294. In addition, the Commissioner must establish that the claimant's skills are transferrable to the new employment, if the claimant was employed in a "semi-skilled" or "skilled" job.[12]

---

[11]  "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §404.1567(a).

[12]  The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled". *Decker, supra*, at 295.
  "Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).
  "Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. §404.1568(b).

*Id.* at 294. This element is particularly important in determining the second prong of the test, whether suitable employment exists in the national economy. *Id.* at 296. Where applicable, the Act's Medical-Vocational guidelines may be used to meet the Secretary's burden of proof concerning the availability of alternative employment and supersede the requirement of vocational expert testimony regarding specific jobs a claimant may be able to perform in the regional or national economy. *Heckler v. Campbell*, 461 U.S. 458, 462 (1983).

In instances where nonexertional limitations diminish a claimant's ability to perform the full range of "light" work, the ALJ should require the Secretary to solicit testimony from a vocational expert regarding the availability of jobs in the national and regional economies suitable for employment of an individual with exertional and nonexertional  limitations similar in nature to the claimant's. *Bapp v. Bowen*, 802 F.2d 606, 501 (2d Cir. 1986). Following a vocational expert's testimony, a plaintiff must be afforded an opportunity to rebut the expert's evidence. *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989).

The ALJ posed hypothetical exertional and nonexertional limitations to the VE related to Plaintiff's limitations (R. 450-52), and the VE reviewed Plaintiff's credentials and limitations, and concluded that substantial gainful employment opportunities exist that an individual of the same age and education as Plaintiff, who was capable of, at most, light and/or sedentary exertion, was capable of performing. (R. 27). The ALJ posed a hypothetical situation to the VE that included limitations particular to Plaintiff, including, occasional interaction with coworkers and the general public, limited in concentration, persistence and pace to performing simple tasks, and should generally

avoid crowds. (R. 450). The VE opined that Plaintiff, including the limitations posed by the ALJ to the VE, would be capable of performing the positions of mailroom clerk (unskilled, light) with 163,664 positions in the national economy, and 786 positions in the New York State Finger Lakes region; plastic molding machine tender (unskilled, light) with 16,447 positions in the national economy, and 390 in the New York State Finger Lakes region; photo finishing (unskilled, light) with 72,000 positions in the national economy, and 210 positions in the New York State Finger Lakes region. (R. 451). The ALJ changed the hypothetical to include the inability to concentrate or persist in tasks up to twenty-five percent of the time (R. 452), which the VE opined would result in the individual's inability to perform any work up to expected productivity standards. *Id*.

The Act requires the ALJ use the same residual functional capacity assessment used to determine if a claimant can perform past relevant work when assessing a claimant's ability to perform other work. 20 C.F.R. § 404.1550(c)(2). "Hypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.'" *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (citing *Gamer v. Secretary of Health and Human Services*, 815 F.2d 1275, 1279 (9th Cir. 1987)). ALJ's are required to provide, at a minimum, the reasons for their decisions, *Connor*, 900 F. Supp. 994, 1003 (N.D.Ill. 1995) (citing *Diaz v. Chater*, 55 F. 3d 300, 307 (7th Cir. 1995)), and remand is proper for consideration of additional evidence not previously addressed. 42 U.S.C. § 405(g), *Connor*, 900 F. 2d at 1004 (remand where ALJ failed to consider entirety of VE's testimony).

In this case, the ALJ concluded, without explanation, that Plaintiff was not disabled even after the VE concluded, in response to the ALJ's final hypothetical, that

unscheduled rest breaks would eliminate, *i.e.*, remove the occupational base of plastic molding machine tender and mailroom clerk. (R. 452). "There must be 'substantial record evidence to support the assumption upon which the vocational expert base[s] his opinion'" *Melendez v. Astrue*, 630 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)). Where, as here, the VE's testimony is essential to a finding of disability, failure to address the VE's determination requires remand, and the ALJ, at a minimum, must articulate the reasons for his decision not to follow the VE's determination that Plaintiff would not be able to perform any work in the national economy if he was off task twenty-five percent of each worday. While it may be that the ALJ presented the final hypothetical to the VE despite the ALJ's disbelief that Plaintiff, in fact, would be off task twenty-five percent of the time, the ALJ's failure to explain as much requires remand. *Connor,* 900 F. Supp. at 1004 (remand ordered where ALJ did not explicitly consider the testimony of the VE on cross-examination).

Therefore, should the District Judge disagree that Plaintiff is disabled under both § 12.02 (organic mental disorders) and § 12.06 (anxiety related disorders) as recommended, the matter should be REMANDED for a rehearing, including testimony from a VE, to whom the ALJ should present hypotheticals that accurately reflect all of Plaintiff's impairments, and a decision explaining why the ALJ either accepts, or fails to accept, the VE's determinations in response to such hypotheticals.

## CONCLUSION

Based on the foregoing, Defendant's motion (Doc. No. 10) should be DENIED,

Plaintiff's motion (Doc. No. 8) should be GRANTED; and the matter should be

REMANDED for calculation of benefits; alternatively, the matter should be REMANDED

for a new hearing with testimony from a vocational expert, consistent with this report

and recommendation.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      January 31, 2011
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that the Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of the Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      January 31, 2011
            Buffalo, New York